UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CATHLEEN MURPHY,

        Plaintiff,

    v.

CALIFORNIA PHYSICIANS SERVICE, et al.,

        Defendants.

Case No. 14-cv-2581-PJH

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**

    The parties' cross-motions for summary judgment came on for hearing before this court on March 15, 2017. Plaintiff appeared by her counsel Corinne Chandler, and defendants appeared by their counsel Linda Lawson. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court GRANTS plaintiff's motion and DENIES defendants' motion as follows.

## INTRODUCTION

    Plaintiff Cathleen Murphy brings this action under § 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), seeking payment of benefits under a Long-Term Disability ("LTD") policy. Defendant California Physicians Service d/b/a Blue Shield of California Long Term Disability Plan ("the Plan") is an employee welfare benefit plan subject to ERISA. The Plan was established by California Physicians Service, which does business as Blue Shield of California ("Blue Shield"). Plaintiff was employed by Blue Shield, and was a participant in the Plan. Defendant The Prudential Insurance Company of America ("Prudential") issued Group Contract No. G-43995-CA to Blue Shield, and is also the Plan Administrator.

With regard to LTD coverage, the Plan provides, in relevant part:

> You are disabled when you are either totally disabled or partially disabled. . . .
>
> You are totally disabled when as a result of your sickness or injury:
>
> ● you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation; and
>
> ● you are not working in your usual occupation.

Administrative Record ("AR") 27. Plaintiff originally submitted her claim for LTD benefits on December 23, 2013. Plaintiff filed the original complaint in this action on June 4, 2014, asserting that Prudential had failed to respond to her claim. Prudential subsequently issued its decision, denying the claim.

The Plan further provides that after 24 months, the definition of disability changes such that in order to be qualified to receive benefits, the participant, based on the same condition, must be unable to perform any occupation that he/she could reasonably be expected to perform based on age, education, training, experience, station in life, and physical and mental capacity. AR 27. It is undisputed that Prudential has made no decision with respect to whether plaintiff is disabled under this second definition.

Plaintiff filed the first amended complaint ("FAC") on June 20, 2014, asserting a single cause of action for ERISA benefits under 29 U.S.C. § 1132(a)(1)(B), seeking payment of benefits, plus interest, and attorney's fees and costs. At the October 16, 2014, initial case management conference ("CMC"), the parties indicated that plaintiff's administrative appeal was still in progress. The court informally stayed the litigation during the appeal process. At a further CMC held on March 3, 2016, the court set a date for plaintiff to file a motion on the appropriate standard of review.

Plaintiff filed a motion to determine that the standard of review is de novo, and on October 3, 2016, the court issued an order granting plaintiff's motion. Pursuant to a briefing schedule set by the court, the parties filed cross-motions for summary judgment on January 18, 2017. They also jointly filed the administrative record.

**BACKGROUND**

*Plaintiff's Education, Training, and Work History*

Plaintiff has undergraduate and graduate degrees in nursing, and worked as a nurse at various locations, including at the University of California – San Francisco ("UCSF") Medical Center.  AR 498-499.

In 1996, plaintiff began her career in Human Resources.  She worked as an executive for different companies until 2004, when she became the Director of Human Resources for Blue Shield.  AR 499.  After one year, she was promoted to Vice President, Human Resources Operations and Welfare ("VP of Human Resources").  She held that position until 2013.  AR 478-480.

Until early 2013, plaintiff's supervisor at Blue Shield was Marianne Jackson, the Chief Human Resources Officer.  Plaintiff worked with Ms. Jackson on a daily basis. Plaintiff has submitted a declaration by Ms. Jackson, in which she states that plaintiff's job had a high level of responsibility and was "very cognitively demanding[,]" and that plaintiff performed her duties "in a competent manner."  <u>See</u> Declaration of Marianne Jackson ("Jackson Decl."), AR 1932-1935, at ¶¶ 2-4.

*Plaintiff's Prior Surgery and Diminished Cognitive Abilities*

In 1988, while working as a nurse, plaintiff began experiencing auditory seizures, precipitated by "hearing a song in her head."  AR 1609.  A neurologist diagnosed a left temporal AVM (arteriovenous malformation).  After experiencing symptoms for approximately three years, plaintiff had an open resection of what she describes as "a lesion in her brain" in 1991.  AR 1609, 1665, 1874.  Following the surgery, she took anti-seizure medication for two years.  AR 1609.  Although she felt dyslexic, and had trouble thinking, she returned to her job after the surgery.  AR 1609.

Plaintiff's former supervisor Ms. Jackson states that, starting in 2011, she began to notice problems with plaintiff's "ideas" (referring to them as "illogical"), and also noticed a decline in plaintiff's speaking and presentation skills.  Jackson Decl. ¶ 4.  As a result, "we created an Individual Development Plan (hereinafter 'IDP') for her to improve some areas

3

of her performance, including improving at making presentations[,]" and also "arranged for her to take a few courses/coaching sessions to improve her presentation skills." Id. At that time, Ms. Jackson was unaware of plaintiff's prior brain surgery. Id.

Ms. Jackson reports that during the period 2011 to 2012, she also noticed a decline in plaintiff's "word-retrieval process" and "speaking/presentation skills." Id. ¶¶ 4-5. In addition, she asserts, a number of plaintiff's colleagues commented on plaintiff's difficulties in meetings during this time period, and also noticed she was having problems with memory, concentration, and word retrieval abilities. Id. ¶ 5.

Plaintiff provides declarations by former co-workers Craig Cadwallader, Earl Barron, and Kerry Hanchett. Mr. Cadwallader worked at Blue Shield as a Senior Manager of Compensation at the time plaintiff was employed there as VP of Human Resources. He left Blue Shield in September 2013, and states that he began to notice a decline in plaintiff's abilities over the course of the last 1/2 to 2 years he worked with plaintiff. Cadwallader Declaration, AR 1928-1930, ¶¶ 3-4.

Mr. Barron was Director of Technology at Blue Shield while plaintiff was employed there. He left Blue Shield in 2013, and states that he noticed that plaintiff "had problems with finding words and finishing her thoughts for quite some time, but because we worked closely, I could often figure out what she meant, so I thought little of it." Barron Declaration, AR 2100-2101, ¶¶ 3-4.

Ms. Hanchett worked at Blue Shield as Senior Program Manager from the time plaintiff was employed as VP of Human Resources, and worked directly with plaintiff on a number of projects. She was laid off in November 2013, and states that in the 11-month period preceding her departure, she noticed that plaintiff had problems with memory, comprehension, "connecting the dots." Hanchett Declaration, AR 2113-2115, ¶¶ 1-4.

Ms. Jackson states that at some point after they put the IDP in place, plaintiff told her that she had had brain surgery about 20 years before, and said that she thought that her medical condition was causing cognitive impairment, memory loss, and difficulties with speech. Jackson Decl. ¶¶ 6-7. Ms. Jackson asserts that plaintiff lost confidence in

4

her ability to adequately present in senior-level meetings, and that around the time that plaintiff disclosed her condition, the two of them decided that Ms. Jackson would conduct the meeting presentations herself, while giving plaintiff credit for the content. Id. ¶¶ 7-8. Ms. Jackson explains that she did this "to ensure our department objectives were not impaired and to personally help [plaintiff] even though it was to my own detriment as it appeared to others I was trying to take credit for [plaintiff's] ideas and micro-managing her department." Id. ¶ 8.

Near the end of 2011, the Chief Executive Officer of Blue Shield announced he was leaving the company. Id. ¶ 9. Ms. Jackson states that this led to her decision to leave the company, which she did in February 2013. Id. She adds that she disclosed plaintiff's cognitive impairment to Blue Shield's then-current Chief Executive Officer and Chief Financial Officer at the time of her departure from the company. Id. ¶ 10.

<em>Planning for Plaintiff's Departure from Blue Shield</em>

Mary O'Hara replaced Ms. Jackson as Chief Human Resources Officer at Blue Shield. On May 2, 2013, plaintiff wrote Ms. O'Hara an email, stating, "I am currently seeking medical care for treatment for exacerbation of a medical condition." AR 2152. A week later, on May 9, 2013, plaintiff wrote Ms. O'Hara early in the morning to say she was taking time off that day for a medical examination, as she had seen her physician the previous day and had received a referral to a neurologist for an MRI and further testing. She added that she hoped to be able to meet with Ms. O'Hara later to discuss the "transition approach" for her role and other issues. AR 2158.

Ms. O'Hara responded approximately an hour later, stating she "was hoping to follow on from our conversation regarding a transitional approach," and adding that she was "glad you are getting quick attention for your medical issue." AR 2161. In a return email a few hours later, plaintiff thanked Ms. O'Hara for her words of support, and stated, "As I get a better sense of the magnitude of this in the coming week or so, I will have a better sense of what I may need from a flexibility/accommodation perspective." She also noted they were set to meet that afternoon on the "transition approach." AR 2161.

Later that afternoon, Ms. O'Hara sent an email to "Senior Staff," advising them "in confidence" that she and plaintiff "have been discussing her role and performance for the past few weeks and some medical issues that she is dealing with[,]" and that they "now agreed that the best outcome is for her to transition in a flexible way for a few months, whilst also dealing with her health issues[,]" at which point plaintiff would depart Blue Shield.  AR 2160.  She added that plaintiff's role "will be split going forward."  AR 2160. Plaintiff received an email from a Senior Staff member that evening, saying he had "just heard about your transition," and asking if there was anything he could do to help.  AR 2163.

Early on the morning of May 10, 2013, plaintiff forwarded the Senior Staff member's email to Ms. O'Hara, asking that she send her the original message or summarize it "so I'm clear in what they hear so I can craft my response."  AR 2163.  Ms. O'Hara responded approximately half an hour later, confirming that she had advised Senior Staff members that plaintiff would be "transitioning flexibly for the next few months and then depart[,]" and would be looking after her health for a while and "we will be backfilling your role but split into total rewards and shared services."  AR 2163.

On May 13, 2013, plaintiff sent Ms. O'Hara an email enclosing the text of an announcement she wanted to send to "all HR" as soon as Ms. O'Hara approved it.  The announcement described various "organizational structure changes" anticipated to follow plaintiff's departure from Blue Shield, which would result in areas of plaintiff's responsibility being re-allocated.  Plaintiff added, "I will be transitioning my role through August."  AR 2165.  Blue Shield later confirmed that over the next few months, entire duties were "transitioned" from Ms. Murphy, including her responsibility for HR Technology, Employee Relations, and Corporate Security.  See AR 247-248.

As of May 24, 2013, plaintiff began taking time off to deal with her medical issues. AR 2195, 2213.  As of that time, she generally worked four days a week.  Because she was upper management, her pay was not reduced, but the time off was recorded as "Personal Time Off" or "PTO."  AR 246-247.  Blue Shield also advised plaintiff that "PTO

1    time" did not count as "earnings" for purposes of the disability plans.  AR 2183.

2         Kerry Daley, the Blue Shield Manager in charge of Absence Management, also

3    corresponded directly with Prudential and with plaintiff regarding plaintiff's eligibility for

4    STD benefits.  AR 2183.  Plaintiff received confirmation from Blue Shield that her PTO

5    time was being recorded.  AR 2195.  On July 18, 2013, Ms. Daley reported the status of

6    plaintiff's reduced schedule to Ms. O'Hara.  AR 2213-2215.  Plaintiff worked a reduced

7    schedule and assisted with the transition of her job duties until August 28, 2013, when

8    she went out on administrative leave.  She remained a full-time employee of Blue Shield,

9    with benefits, until January 3, 2014.  AR 419.

10                        *Initial Medical Testing and Evaluations*

11        Plaintiff consulted with her primary care physician, Margaret Forsyth, M.D., on May

12   8, 2013, regarding the symptoms she had been experiencing.  AR 561.  Dr. Forsyth

13   referred plaintiff to a neurologist, Adama Frye, M.D.  AR 559-561, 1609.  Dr. Frye

14   referred plaintiff for an EEG on May 18, 2013, and a brain MRI on May 20, 2013.  AR

15   552-556.  The EEG was normal, and the brain MRI revealed mild gliosis around the

16   surgical resection cavity.  AR 550, 669-670.

17        At the initial consultation with Dr. Frye on June 6, 2013, plaintiff reported

18   occasional auditory seizures "[o]ver the past several years," and also stated that "in the

19   last 6-8 months her degree of dysphasia seems to be worsening, noted personally and

20   from friends" and co-workers."  AR 547.  Dr. Frye conducted mental status and language

21   screening tests, and recommended formal neuropsychological assessment, to include

22   language testing, and also suggested anti-seizure medication.  AR 549-550, 1609-1615.

23   Dr. Frye also discussed EEG testing, but explained that local seizures are potentially

24   missed on EEG testing.  AR 550, 1615.

25        Plaintiff was initially reluctant to try Keppra, the anti-seizure medication

26   recommended by Dr. Frye, because of a prior bad experience with another anti-seizure

27   medication.  AR 545-546.  However, she ultimately agreed to a trial of Keppra, but on

28   July 22, 2013, reported to Dr. Frye that she had to stop taking it because it was

worsening her symptoms. AR 538-539. Dr. Frye responded that plaintiff's reported symptoms were "very unusual with Keppra," but agreed on July 26, 2013, to a trial of another medication, Vimpat. AR 537-538. Plaintiff agreed, but asked that the trial be delayed until after completion of the baseline speech assessment. AR 536-537.

In July 2013, plaintiff submitted a claim for STD Benefits, which was handled by Sedgwick Claims Management Services, Inc. ("Sedgwick"), the STD administrator. AR 1854. In support of plaintiff's claim, Dr. Frye reported that plaintiff had a seizure disorder and had only been working 4 days a week since May 24, 2013. AR 101-102, 740-741, 1575.

Sedgwick determined that plaintiff should undergo a neuropsychological examination. On August 16, 2013, Sedgwick's evaluation service sent plaintiff notice of an Independent Neuropsychological Evaluation scheduled for September 9, 2013, with William D. Hooker, Ph.D. AR 2345. Three days later, another Sedgwick evaluation service sent plaintiff notice of an Independent Neuropsychological Evaluation scheduled for September 12, 2013, with Peter Karzmark, Ph.D. AR 2347. Plaintiff notified Sedgwick of the scheduling mistake and additionally advised that the examinations would conflict with the examination ordered by her physician. On September 16, 2016, Sedgwick denied the claim. The sole explanation in the denial letter was "Insufficient Medical received." AR 1651. However, Sedgwick's claim notes indicate that the reason for the denial was that "medical does not support ongoing disability as severity has not been established per plan and [claimant] did not attend scheduled IME." AR 1864.

Meanwhile, Dr. Frye saw plaintiff for a follow-up appointment on August 28, 2013. AR 527-529. Dr. Frye ordered an EKG, and advised plaintiff later in the day on August 28, 2013, that it appeared "normal." AR 532. Dr. Frye also instructed plaintiff to "go ahead and start the Vimpat." AR 532. On September 19, 2013, plaintiff reported that she had tried the sample of Vimpat that Dr. Frye had given her, and stated that "it seems to be tolerated[,]" and that "the cognitive and speech difficulties" she had on the last medication had not occurred, although she reported some side effects. AR 521.

1   However, on September 25, 2013, plaintiff was advised that her insurance would not

2   cover the Vimpat prescription.  AR 518-519.  Dr. Frye agreed to provide plaintiff with

3   additional samples of the medication.  AR 518.  Plaintiff had a follow-up neurology

4   consultation with Dr. Frye on August 28, 2013.  AR 2010.

5        On September 18, 2013, as recommended by Dr. Frye, plaintiff underwent a

6   speech-language and cognitive-linguistic evaluation with Michelle Shimamoto, a Speech-

7   Language Pathologist at Mills Peninsula` Medical Group.  AR 147-149.  Ms. Shimamoto

8   noted that plaintiff's "language and cognition" were "grossly functional for routine/daily

9   activities and simple/social conversation," but that "[d]ifficulty occurs with discussion

10  surrounding complex/abstract ideas."  AR 149.

11       Ms. Shimamoto found that plaintiff was unable to express herself in a timely

12  manner, which was required for "managing medical, financial and vocational affairs[;]"

13  that she had delayed auditory processing and reduced comprehension for conversation;

14  that she employed compensatory measures, and that she had "deficits within the areas of

15  attention, auditory processing memory, thought organization and executive functioning."

16  AR 149.  Ms. Shimamoto also noted that plaintiff "required a very high functioning

17  baseline to conduct the level of work that was required of her in her previous job duties,"

18  but stated that it was "unclear . . . what the etiology of this progressive decline might be"

19  and added that she would "lean heavily upon further work-up by physician and future

20  neurology and neuropsychology evaluation results to hopefully gain some answers."  AR

21  149.

22       On October 10 and 14, 2013, Dr. Hooker conducted the previously-scheduled

23  Independent Neuropsychological Evaluation, and he issued a report October 16, 2013.

24  AR 491-517.  Dr. Hooker's tests included embedded validity measures.  AR 502.  Dr.

25  Hooker reported that the test results were valid and that measures of plaintiff's auditory

26  attention, concentration, language functioning, speed in detecting numbers, and working

27  memory were borderline impaired to low average.  AR 516.  Plaintiff's overall immediate

28  memory and reasoning were "average" which fell "significantly below the predicted

9

1   range," for one with her post graduate education and executive occupation. AR 516. Dr.

2   Hooker diagnosed plaintiff with a cognitive disorder and opined that she could not

3   perform the usual and customary duties of her executive position or any occupation

4   requiring higher cognitive functioning. AR 517.

5       In the October 29, 2013, report of neurology follow-up visit, Dr. Frye wrote that in

6   the "mental status" evaluation, plaintiff had halting speech at times, with word-finding

7   difficulties. AR 2008. Dr. Frye recommended that plaintiff consult with the UCSF

8   Memory/Behavioral Clinic to determine if a clear diagnosis could be made. Dr. Frye

9   stated that she would continue to support plaintiff's disability claim. AR 2010.

10      On December 2, 2013, plaintiff consulted with Georges Nassan, M.D., at the

11  UCSF Memory Clinic. AR 1672, 2261-2263. On December 9, 2013, plaintiff reported to

12  Dr. Frye that Dr. Nassan believed her cognitive and language impairments were

13  permanent, as the repaired area in her brain was more "vulnerable" to cognitive and

14  memory decline which happens with aging. Thus, the compensation techniques she had

15  previously successfully employed were no longer working. AR 2042. Dr. Nassan

16  requested that plaintiff obtain her prior MRI and submit it for comparison, that "all

17  vascular risk factors be controlled" (blood pressure, LDL cholesterol, glucose), that

18  plaintiff engage in "routine exercise and a healthy diet," and she begin some "cognitive

19  rehabilitation." AR 2261. He also recommended that she obtain a driving evaluation. AR

20  2263. Plaintiff advised Dr. Frye that Dr. Nassan would be sending her a note, and Dr.

21  Frye confirmed on December 10, 2013 that she had received the note. AR 2042.

22                          *Appeal of Denial of STD Benefits Claim*

23      On December 23, 2013, plaintiff submitted her appeal to Sedgwick regarding the

24  denial of STD benefits. To facilitate the transition to LTD benefits, plaintiff also provided

25  a copy of the STD appeal submission to Prudential, and requested that Prudential begin

26  processing her LTD claim. AR 1663. The claim request was delivered to Prudential on

27  December 29, 2013. AR 462. With the appeal, plaintiff submitted the speech therapy

28  records, Dr. Hooker's neuropsychological testing, and updated medical records from Drs.

Frye and Forsyth. AR 1663-1669.

Sedgwick referred plaintiff's claim for review by Staci Ross, Ph.D., an internal clinical psychologist. Based on her review of the speech therapy records and Dr. Hooker's neuropsychological testing, Dr. Ross concluded in a report dated February 11, 2014, that Ms. Murphy was disabled. AR 079. Dr. Ross stated that those records "confirmed a cognitive disorder, impacting language disturbances, memory, executive functioning, right sided motor skills and visual spatial dysfunction, in which the combination of cognitive difficulties demonstrated would preclude her ability to function in her regular, unrestricted occupation." AR 079.

Dr. Ross concluded that this cognitive disorder would impact plaintiff's ability to "function in her regular unrestricted position in that she would have difficulties with higher level skills of thinking creatively, strategically, abstractly, analytically . . . ." AR 079. Plaintiff would also have "difficulties being able to think critically, evaluate situations, problem solve, and make decisions as well as organize priorities, and manage time effectively." AR 079. Dr. Ross opined that "[d]isability would be expected to be indefinite, secondary to neurological changes that have occurred." AR 079. However, she also recommended "re-assessment of disability" in approximately two years. AR 079.

On February 24, 2014, Sedgwick reversed its claim decision and approved plaintiff's disability through the maximum STD duration, to November 19, 2013. AR 077-078. A separate disability carrier, Unum, also approved plaintiff's STD disability claim. AR 2359.

*Prudential's Review of Plaintiff's LTD Claim*

On February 24, 2014, Prudential referred plaintiff's claim to Melvyn Attfield, Ph.D., an internal Prudential consulting neuropsychologist. AR 820-822. Dr. Attfield reviewed plaintiff's claim and issued a report on March 4, 2014. AR 815-820. Among other things, Prudential asked Dr. Attfield to determine whether the neuropsychological testing showed that plaintiff had significant memory and/or cognitive impairments which would preclude her ability to perform the job of VP of HR Operations. Dr. Attfield

concluded that Dr. Hooker's testing revealed cognitive deficits that prevented plaintiff

from performing her occupation:

> In conclusion Dr. Hooker provided a validated and
> comprehensive assessment of neuropsychological function . .
>
> [T]he clinical impressions of the examiner suggested the
> insured employed active compensatory strategies (requesting
> clarification, circumlocution, using her digits and rehearsing
> during digits reverse and sequencing tasks) to enhance her
> performance. It would therefore be reasonable to conclude
> areas of impairment in right hand motor function, difficulty
> processing complex information, efficiently naming problems
> within the context of generally average but likely below pre-
> morbid function in aspects of memory, non-verbal intellectual
> abilities (more fluid aspects of intelligence.)

AR 819-820.

Dr. Attfield noted that "[t]here is no report of the seizures limiting the insured from

her job," and "[t]here is no report of an antecedent medical event impacting her current

condition." AR 820. Nevertheless, he found that plaintiff "has a work capacity but based

upon the likely job demands assumed by a VP of HR the cognitive restrictions would be

expected to limit her from a position requiring higher executive skills and facile social

interaction[,]" although he also indicated that the file did not contain a job description. AR

820.

Dr. Attfield found that Dr. Hooker's neuropsychological assessment "provided

detailed metrics of areas of relative and clinical impairment." AR 820. He noted that Dr.

Hooker "did not consider the site of the AVM resection sufficient to explain data

implicating a "larger left cerebral hemisphere involvement," and had recommended

further neurological workup. AR 820. Dr. Attfield found it "reasonable to obtain medical

information subsequent to the neuropsychological assessment to determine if further

work-up has been completed and what the results would be[,]" and requested any

"updated notes." AR 820.

In a report dated March 12, 2014, Prudential Disability Claim Consultant Kimmura

Chadwick determined that "it would seem reasonable that [plaintiff] would carry an

impairment" from the date of disability to that point. AR 815. On March 13, 2014, Ms.

1    Chadwick initiated contact with Blue Shield Human Resources to inquire about plaintiff's

2    salary, the last day of work, and job duties.  AR 841.  On March 14, 2014, Ms. Chadwick

3    advised plaintiff's attorney that plaintiff's claim was "approvable," and that Prudential was

4    "just waiting on her earnings" and last day worked.  AR 836.  She indicated that the

5    decision could be communicated to plaintiff.  AR 836.  On March 20, 2014, an in-house

6    attorney for Blue Shield, Marcy St. John, instructed Ms. Chadwick to communicate with

7    her regarding the claim. AR 401, 842.

8                           *Prudential's Initial Review of Plaintiff's Claim*

9           On March 20, 2014, Ms. Chadwick wrote Ms. St. John to ask for the following

10   information:  the date plaintiff stopped working altogether; whether plaintiff worked part-

11   time from May 23, 2014, to August 2014 (and if so, asked that Blue Shield "document the

12   work schedule to include days missed due to sickness"); a breakdown of salary, including

13   bonuses received; and a job description "so that we may better understand Ms. Murphy's

14   job requirements."  AR 400-401.  That same day, Ms. St. John responded that plaintiff

15   was expected to work through August 31, 2013, that she was placed on administrative

16   leave effective September 1, 2013, and that she was receiving full pay throughout 2013

17   until termination of her employment on January 3, 2014; that her time off in 2013 included

18   "paid time off" or "PTO," with no separate "sick leave" time; that Blue Shield could not

19   provide a breakdown of salary until Prudential indicated "date of disability;" and that a job

20   description was attached.  AR 400.

21          Also on March 20, 2014, Prudential conducted a vocational review to determine

22   the material and substantial duties of plaintiff's occupation.  AR 808-814.  The Prudential

23   reviewer stated that the VP of Human Resources was responsible for "delivering

24   excellent execution" of programs offered by the following HR teams/functions:  "Benefits,

25   compensation, Absence Management, HR Share Services Employee Service Center, HR

26   Technology, and Employee Relations."  AR 809.  The reviewer also stated that the VP of

27   Human Resources was responsible for Blue Shield's "compensation and benefits

28   strategy, planning, policies, programs, systems, and implementation[;]" was required to

13

interact with Blue Shield's Executive Committee, Executive Benefits and Compensation

Committee of the Board, and other executive management groups within Blue Shield,

and to act as a "close advisor to Senior Management within the company to ensure that

the company's strategic initiatives and objectives [were] being supported; and was tasked

with leading strategic planning for functional teams, which included "oversight of policies,

process, and procedure improvement and budget planning related to areas of

responsibility including pension, 401K, retiree health, compensation plans, and HR

employee services model."  AR 809.

Among the "cognitive skills" required for this position was the ability to "[t]hink

creatively, strategically, concretely, and abstractly."  In addition, the VP of Human

Resources was required to "[r]ead, comprehend and use written materials including

graphs, charts and displays[;]" [t]hink critically and act logically to evaluate situations,

solve problems and make decisions[;]" "understand and solve problems involving

analytics and use the results[;]" "[w]ork independently and change focus (for example,

juggling priorities)[;]" and "manage time effectively."  AR 810.

After considering plaintiff's job description and other vocational resources, the

reviewer described the position of VP of Human Resources as

> an evolving, continually changing occupation due to local,
> state and federal regulations.  In order to successfully
> complete tasks, higher executive functioning is routinely
> utilized to strategically implement policies and practices that
> comply with ever changing state, local and federal law.

AR 813.

On March 28, 2014, Ms. Chadwick wrote Ms. St. John a "follow-up," asking about

the nature of plaintiff's administrative leave – whether it was "due to performance[,]" or if

not, "what was the basis for the leave?"  AR 399.  Ms. St. John responded that she did

not have an answer as to the reason for the administrative leave, but was making

inquiries.  AR 397.  On March 31, 2014, Ms. Chadwick wrote to ask whether Ms. St. John

had any further information, and also asking about the "rationale" for paying plaintiff her

full salary through the end of the year.  AR 397.  On April 7, 2014, Ms. Chadwick again

14

wrote to ask whether Ms. St. John had any updated information regarding the "outstanding response[s]." AR 396. On April 7, 2014, Ms. St. John responded that she would like to speak to Ms. Chadwick about her requests, and asked for a direct phone number. AR 396. However, if this conversation did take place, it does not appear to have been recorded in the administrative record.

On April 14, 2014, Ms. Chadwick made notes regarding a call among herself, another Prudential representative, and two Sedgwick representatives, including "Stacie." Ms. Chadwick asserted that "Stacie" provided "background about the claim," including that "apparently," plaintiff's job was "being phased out[;]" that "she signed a service agreement in May 2012 which led to the 9-1-13 admin leave[;]" that the "terms of agreement were revealed via a same time session to both Stacie (Sedgwick) and Melanie (Pru)[;]" and that this agreement "provided a pay out (unknown amount)" and plaintiff "was to continue working to help transition her work from [M]ay 2013 to Aug. 31, 2013." AR 845.

Ms. Chadwick's notes reflect that she asked the other call participants whether plaintiff worked part time, noting that part time work was not documented and that time cards showed plaintiff working full time but taking days off. AR 845. According to Ms. Chadwick, the participants in this call then discussed the decision by Sedgwick to approve STD benefits; the "fact" that plaintiff was "not treating with anyone or taking any meds at this time[;]" and "that it appears" that plaintiff was "performing her job from May to August 31, 2013." AR 845.

Ms. Chadwick states that one of the participants asked how Sedgwick's contemplated change of plaintiff's date of disability ("DOD") to August 31, 2013, would impact the LTD claim. AR 846-847. Ms. Chadwick indicated that she was not sure, adding that "it doesn't look like she is receiving any meds" and that it "appears as though [her] claim was initiated" because her job was being eliminated "and she continued to perform [her] usual occupation while being disabled." AR 847.

On April 16, 2014, Ms. Chadwick wrote Ms. St. John with a series of "additional

1  questions." AR 249. First, she asked for an explanation of the difference between "PTO

2  S" and "PTO U." Second, she asked Ms. St. John to review the timeline of events

3  provided by plaintiff regarding her going on "full leave" as well as the list of job tasks that

4  were "removed from her assignment." AR 249.

5        On April 23, 2014, Ms. St. John responded, first, that "PTO U" is used for

6  unexpected PTO days, such as "calling in 'sick,'" while "PTO S" is used for pre-planned

7  and scheduled PTO days. However, she added, for an employee like plaintiff at the VP

8  level, there would be no difference between the two codes from a pay or policy

9  perspective. AR 246. Second, Ms. St. John stated that Blue Shield could not confirm

10  exact dates that plaintiff might have taken off from work due to disability during the period

11  May-August 2013 as Prudential had requested, because plaintiff was paid as a full-time

12  employee during the period up to the end of August 2013, and as an exempt executive,

13  she managed her own schedule. AR 247. Third, Ms. St. John stated that she was still

14  researching the question when certain duties and responsibilities were reassigned from

15  plaintiff to others during the period May-August 2013, although she was able to provide

16  some details. AR 247-248.

17        On April 24, 2014, Ms. Chadwick wrote plaintiff's counsel stating that since their

18  last conversation, she had received "conflicting information" regarding plaintiff's "DOD,

19  pay through, work task and potentially med condition." AR 846. She added that she was

20  reviewing plaintiff's job description against information provided by Blue Shield in

21  response to plaintiff's account of what she did between May 2013 and August 31, 2013.

22  AR 846. According to Ms. Chadwick, this would "help determine " if plaintiff "was indeed

23  performing the M&S duties of her [regular occupation] during the time she claimed to

24  have been at least partially disabled." AR 846. Ms. Chadwick stated that "[t]his has

25  impact on Ms. Murphy's DOD. It does not appear that she was disabled as of May 24

26  given she was performing job task[s] and the [employer] is not accounting that Ms.

27  Murphy was partially or fully disabled, rather she was expected to work full time through

28  beginning 8-31 . . . during this time she was expected to be available via phone for any

1  questions."  AR 846.

2  In an internal Prudential report dated April 24, 2014, Ms. Chadwick stated that

3  plaintiff "appears to have worked full time through 8-31-13 and was placed on

4  administrative leave as of 9-1-13."  AR 801.  Ms. Chadwick claimed that the

5  administrative leave was "part of an agreement" that plaintiff had with Blue Shield as her

6  job "was being phased out[;]" that plaintiff "was expected to continue working" full time

7  through August 31, 2013 "and to be available via phone beyond this date for any

8  questions" Blue Shield might have; and that she was on administrative leave from

9  September 1, 2013, and terminated effective January 4, 2014.  AR 801.  Ms. Chadwick

10  also claimed that plaintiff scheduled her own neurological testing "through her attorney"

11  after learning her job was being phased out."  AR 801.  Prudential subsequently referred

12  the claim to its in-house reviewer, Dr. Attfield, for further review.  AR 803.

13  A May 1, 2014, Prudential "Milestone" report prepared by Ms. Chadwick, stated

14  that although "the records" indicated part time employment, Blue Shield "would not

15  confirm" part time work.  AR 794.  In addition, while Blue Shield had confirmed that

16  Employee Relations, Corporate Security and HR Technology had been reassigned from

17  plaintiff, Ms. Chadwick asserted that there were minimal changes to plaintiff's job and that

18  plaintiff "voluntarily relinquished some duties."  AR 794.  Ms. Chadwick concluded that

19
20
21
22
> [a]lthough there was some shifting in areas of responsibility
> during the 5/24/13 to 8/28/13 time frame, the employer states
> she was paid at her normal rate of pay, stated she was not on
> a leave or reduced work schedule due to disability[,] and
> maintained responsibility for budget planning and direct
> reports[.]

23  AR 795.  "As such," she concluded, plaintiff "was performing the material and substantial

24  duties of a Vice President until her last day worked on 8/28/13."  AR 795.

25  *Prudential's In-House Medical Reviews and Initial Claim Decision*

26  As previously described, Dr. Attfield reviewed Dr. Hooker's neuropsychological

27  results in March 2014, and concluded that plaintiff was disabled from her own occupation.

28  Following the above-described May 1, 2014, vocational review, Dr. Attfield reviewed

17

1   additional records and provided a supplemental opinion on May 5, 2014.  He noted that

2   there was no updated neuropsychological testing, but asserted that based on Dr.

3   Hooker's report, impairment was supported until updated neuropsychological testing

4   could be obtained.  AR 793.

5       Further reviews of plaintiff's file were conducted by Rajesh Wadhwa, M.D., and

6   Alan Neuren, M.D.   Dr. Wadhwa, an internal Prudential reviewer who is board-certified in

7   Internal/Occupational Medicine, stated in a report dated May 20, 2014, that "[w]ith a GAF

8   score of 65" reported by Dr. Hooker in October 2013, plaintiff "should likely have

9   psychological competence for work – medical restrictions for work are not necessary."

10  AR 782, 784-785.  He also noted, however, that plaintiff's "capacity – or lack of it, due to

11  cognitive dysfunction needs to be deferred to appropriate specialist."  AR 784.  He

12  concluded that the question whether plaintiff "can handle the executive functions of her

13  job" is one that "needs to be answered by occupational experts – it is outside the realm of

14  this review."  AR 784.  He opined that plaintiff "has always had capacity to function

15  physically" and has also had "psychological capacity" as shown by the GAF score of 65 in

16  October 2013, but he was "unable to say why she would not be able to do her job," a

17  question he reiterated "should be referred to occupational specialists."  AR 785.

18      On May 20, 2014, Dr. Wadhwa sent a letter to Dr. Frye, stating that he found that

19  plaintiff "has physical capacity from a medical perspective for sedentary work though she

20  may be limited due to cognitive deficits," and that the neuropsychiatric assessment of

21  October 2013 documented a GAF of 65, which he opined "by definition shows

22  psychological capacity for some kind of work."  AR 853.  He added that plaintiff "may not

23  have the executive skills to carry out her job functions; nevertheless she has the capacity

24  to work as stated by her in her ADL questionnaire."  AR 853.  He asked Dr. Frye whether

25  she could "kindly comment" within two weeks of receipt of the letter.  AR 853.  Dr. Frye

26  responded with a note stating, "Patient not seen since 10/29/13."  AR 73.

27      On June 4, 2014, Dr. Wadwha reported that plaintiff had not seen "her

28  psychologist" [sic] Dr. Frye for more than six months," and opined that "[i]n the absence

18

of any evidence for psychological impairments serious enough to impair work (last GAF 65) the limitations are not supportable. Medical restrictions are not required as determined in my last file review." AR 777-778.

Prudential then referred plaintiff's claim file to Dr. Neuren, a consulting neurologist. On June 5, 2014, Dr. Neuren issued a summary report in which he first stated that plaintiff was "claiming to be impaired due to cognitive symptoms she attributes to an AVM that was resected over twenty years ago[,]" and added that plaintiff's job "was in the process of being phased out." AR 773.

Dr. Neuren opined that plaintiff's original surgery was not impairing and that she was capable of "gainful employment," as demonstrated by the fact that she worked as a nurse following her surgery, and the fact that there was "no evidence of any recurrence of the AVM." AR 773. He stated that "any cognitive problems if any would have been maximal at the time the AVM was treated" and "[t]here should be no worsening or progression." AR 773. He added that if plaintiff were experiencing seizures, "this should have been addressed or would have been addressed by instituting an anti-convulsant." AR 773. He found "no plausible or credible reason for her to be cognitively impaired at this time." AR 773.

On June 12, 2014, Prudential issued a decision denying plaintiff's claim. AR 878. Prudential's denial letter summarized the medical evidence, recited plaintiff's symptoms, and referred to plaintiff's contact with her attending physician in an effort to obtain information requested by the disability administrators. AR 878-888. Despite the disability certifications by Drs. Forsyth and Frye, Prudential stated that "records do not show that neither [sic] Dr. Forsyth nor Dr. Frye found you to be disabled." AR 886. Instead, Prudential asserted, "information suggest [sic] that you directed both physicians regarding your level of impairment and ability by drafting your own disability statement to include diagnosis codes, dates, and restrictions." AR 886.

Prudential also stated that on July 19, 2013, it was "made aware" that plaintiff was "notified" by her employer in May 2013 that she "would no longer be working for the

1  organization[,]" but that she would "be continued as an active employee" while she

2  "helped transition" her role.  AR 886.  Prudential cited unspecified "information from

3  [plaintiff's] employer," which indicated that plaintiff's job "was being eliminated."

4  "Coincidentally," Prudential added, "this is when you report experiencing symptoms which

5  you claim preclude you from working."  AR 887.

6        Prudential acknowledged that Dr. Hooker had provided a "validated and

7  comprehensive" assessment of neuropsychological functioning and that Dr. Hooker's

8  opinion of impairment, based on the scoring with estimated pre-morbid performance was

9  a "reasonable strategy for assessing cognitive strengths and weaknesses."  AR 887.

10  Prudential did not mention Dr. Attfield's initial medical review, where he determined that

11  Dr. Hooker's opinion was reasonable and that impairment was supported.  Nor did it

12  mention the review by clinical psychological Dr. Ross, for Sedgwick, which also

13  supported disability.

14        In denying plaintiff's claim for benefits, Prudential found that plaintiff was not

15  disabled from performing the duties of her usual occupation.  Prudential asserted that the

16  record showed that plaintiff had demonstrated her ability to "perform the substantial and

17  material acts necessary" to pursue her usual occupation from May 24, 2013, through the

18  start of her administrative leave of September 1, 2013.  AR 887.  Prudential found "no

19  indication" that if plaintiff continued her employment with her employer, she would have

20  been impaired from performing the substantial and material acts necessary to perform

21  her usual occupation.  AR 887.  Prudential determined that plaintiff had left her job

22  because Blue Shield was eliminating the position, not because she was disabled from

23  performing her job duties.  AR 887.

24        Prudential also asserted that because there were no medical records showing that

25  plaintiff had reported the symptoms she claimed she was experiencing during the 6-8

26  month period prior to the onset of her disability, there was "no evidence" that she had in

27  fact been experiencing those symptoms as she indicated during her initial visits with Drs.

28  Forsyth and Frye in May 2013.  AR 886.

Prudential found further that there were no additional neurological records dating from the period after October 29, 2013, when plaintiff had last seen Dr. Frye, and that it was not possible that any of plaintiff's symptoms could be related to the AVM that was resected more than 20 years previously, because plaintiff had reported no symptoms during the intervening period.  AR 887.  Prudential stated that any seizures plaintiff was experiencing could have been treated with anti-convulsant medication, and that because plaintiff was "capable of gainful employment for many years" after she was treated for the AVM, "there would be no plausible or credible reason" for her to be cognitively impaired at this time.  AR 887.

On September 25, 2014, a little over three months after Prudential denied plaintiff's claim, Blue Shield determined that plaintiff was disabled under a more stringent "any occupation" standard of disability, when it approved plaintiff's disability for a waiver of premium for her life insurance, stating that she was unable to perform, within reasonably continuity, "any gainful occupation for which the Insured Person is reasonably fitted by education, training and experience."  AR 2107.

*Plaintiff's First Appeal to Prudential*

On October 21, 2014, plaintiff submitted her first appeal to Prudential.  AR 2133.  With the appeal, plaintiff included evidence refuting Prudential's assumptions regarding the reasons she left work, and its conclusion that she was performing the substantial and material duties of her occupation from May 2013 to September 2013.

Plaintiff submitted declarations from her former supervisor, Ms. Jackson, and co-workers, attesting to her inability to perform her job duties in late 2011 and 2012.  AR 1928, 1932, 2100, 2113.  Indeed, plaintiff noted, Ms. Jackson found the cognitive deficits to be of such significance that she reported the issue to the CEO and CFO of Blue Shield before she left her employment in February 2013.  See AR 1935.  Plaintiff also submitted the emails from the Blue Shield Absence Manager, which directly refuted any claim that Blue Shield might have asserted as to its ignorance of plaintiff's reduced work schedule and disability.  AR 2152-2215.  These emails showed Blue Shield's knowledge of

1   plaintiff's reduced work schedule, and also showed that Blue Shield was actively

2   assisting plaintiff with her disability claim in the June-July 2013 time period.

3          In addition, plaintiff responded to Prudential's assertion that she had "directed" her

4   physicians' disability certifications.  She pointed out that Sedgwick had contacted her

5   physicians nine times during the period July 22, 2013 to August 2, 2013, requesting

6   information and diagnostic codes.  She asserted that Sedgwick had also expressly told

7   her that it was her responsibility to ensure that her physicians timely responded to

8   requests for information.  AR 2139; see also AR 1881-1885, 1889, 1893, 1901, 1905.

9          Plaintiff agreed that she did suggest wording for a July 10, 2013 letter sent by Dr.

10  Frye to respond to Sedgwick's inquiry regarding plaintiff's condition and ICD 9 codes.

11  The letter stated that plaintiff was under care for AVM, focal seizure disorder, and

12  language changes.  Dr. Frye recommended additional testing and an extension of

13  disability.  However, this report was consistent with Dr. Frye's prior office note of June 20,

14  2013, wherein Dr. Frye noted that plaintiff's complaints were consistent with seizures,

15  and recommended further testing and medication.  AR 2139, 1615.

16         Plaintiff also rebutted the suggestion that she was performing her usual job duties

17  up to September 2013.  She asserted that the evidence showed that significant functions

18  had in fact been removed from her responsibilities during the summer of 2013.  AR 2147,

19  885.  Moreover, as of May 9, 2013, Ms. O'Hara had informed a select group of staff that

20  plaintiff's duties would be "split" going forward and that she would be transitioning "so that

21  she could deal with her health issues."  AR 2147, 2160.  Because Prudential disputed

22  that her work schedule was reduced, plaintiff also provided copies of her pay stubs,

23  proving that that she worked a four-day work week and received PTO pay.  AR 2430-

24  2467.  Finally, plaintiff provided updated medical records, including records of her

25  consultation with the UCSF Memory Center, wherein it was recommended that she

26  obtain a driving evaluation.  AR 2263, 2330-2334.

27         Upon receipt of plaintiff's appeal, Prudential referred plaintiff's claim for review to

28  Jonathan S. Mittelman, M.D., an in-house Prudential reviewer who is board-certified in

Occupational and Environmental Medicine.  In his November 12, 2014, report, Dr.

Mittelman discounted disability and stated that he agreed with Dr. Neuren's opinion that

there was "no plausible or credible reason" for plaintiff to be cognitively impaired at this

time.  AR 2560.  Dr. Mittelman based this conclusion primarily on the fact that plaintiff had

returned to her job as a nurse after the 1991 surgery, and the fact that she had been

working as a nurse and then as "VP of human relations" [sic] for over 20 years.  AR 2560.

Dr. Mittelman found it "[o]f note" that "the downsizing of claimant's position began

in December 2012," AR 2560, though he does not indicate where in plaintiff's claim file

this was reflected.  He asserted that "[t]he only significant correlate with the claimant's

self-reported cognitive decline was the effect on her job position, which was necessitated

by business concerns, not on the basis of the claimant's ability to perform."  AR 2560.

Again, he did not cite any evidence supporting this assertion.  In response to Prudential's

question whether plaintiff's symptoms "restricted or limited her ability to sit, stand, walk,

reach, lift, carry, and perform upper extremity activities on a sustained full-time basis from

May 24, 2013 through the present," Dr. Mittelman stated that "there is no basis for

restricting claimant."  AR 2560.

In response to Prudential's request that he comment on the opinions of plaintiff's

treatment providers, and whether any of the treatment providers had offered the opinion

that plaintiff's condition had become disabling, and what specific opinions were

documented concerning plaintiff's "functionality and ability to perform work duties," Dr.

Mittelman responded that Dr. Frye had noted at one point that plaintiff would be able to

return to work on January 14, 2014.  AR 2560.  This was apparently a reference to a

letter from Dr. Frye dated September 3, 2013, stating that plaintiff "has been unable to

work since August 28, 2013" and providing an "[e]stimated return to work date" of

January 14, 2014.  AR 1649.

Dr. Mittelman also stated that Dr. Hooker had found in his October 2013

evaluation that plaintiff had "cognitive dysfunction" and was "disabled from working in her

usual and customary executive position or in any position requiring cognitive functioning."

23

AR 2560. He added, however, that "[n]o driving restrictions were given, as would be expected in a patient with an active seizure disorder." AR 2560. In addition, he stated that the record showed that plaintiff tolerated the Keppra she was prescribed by Dr. Frye, "without difficulty," AR 2560, which is clearly not what the record shows, see AR 536-539, 545-546, 550. Finally, he recommended repeat neuropsychological testing, including a MMPI-2 test. AR 2560.

Prudential notified plaintiff that it had scheduled neuropsychological testing, but told her that the test was not to occur until February 13, 2015. AR 1778. Plaintiff protested the delay, and scheduled her own repeat neuropsychological testing with Dr. Hooker on January 8, 2015. AR 1764. On January 15, 2015, plaintiff notified Prudential of the recent testing by Dr. Hooker and promised to send the report when it was available. AR 1764.

### The 2015 Testing by Dr. Hooker and Dr. Cahn-Weiner

Following the repeat testing, Dr. Hooker issued a report on February 9, 2015. See AR 895-915. He noted that plaintiff reported experiencing "cluster seizures" in September 2014, while traveling. AR 913. He again administered validity testing and determined that she exerted good effort and cooperation. AR 903. Testing of upper extremity revealed the same "significant" weakness in the dominant right hand as previously; and auditory working memory, auditory verbal test results, and word fluency were average, but significantly below the range expected. AR 903-906. He found that plaintiff tested "significantly lower" than expected of someone with her education and background in immediate and delayed recall, which showed incomplete and inefficient learning. AR 905-906, 913-915.

Dr. Hooker concluded that plaintiff continued to demonstrate the same neuropsychological deficits identified in his October 2013 testing, although she had more memory errors than was apparent in the first evaluation. He continued to believe that plaintiff was disabled from her usual and customary executive position, or any occupation requiring higher cognitive functioning. AR 915. He also noted that the results of the

objective measure of emotional functioning (MMPI-2) indicated moderate to severe depression, mild anxiety with posttraumatic features, and mental functioning complaints – specifically, problems with attention, concentration, and memory, and slower mentation. AR 915.

Meanwhile, Prudential scheduled its own neuropsychological testing with Deborah Cahn-Weiner, Ph.D, for January 23, 2015. Dr. Cahn-Weiner issued her report on February 2, 2015. See AR 1123-1142. Dr. Cahn-Weiner was not initially aware of Dr. Hooker's recent repeat testing, and was not provided with any results from that testing. AR 1133. She stated in her report that once she learned of the recent testing, she decided to proceed with the assessment using "an alternative battery of tests." AR 1133.

Dr. Cahn-Weiner administered several tests, which included at least 3 embedded validity tests. She reported that plaintiff passed one of those tests, indicating "that she answered in a reasonably forthright manner and did not attempt to present an unrealistic or inaccurate impression." AR 1135. However, one of the tests, "the b test" asked the test taker to distinguish between "b" and "d" in printed text. Plaintiff made errors that, in the words of Dr. Cahn-Weiner, were "suggestive of non-credible cognitive performance." AR 1133. Dr. Cahn-Weiner also reported that plaintiff tested in the "impaired" range for memory and attention and average scores in other fields. Since plaintiff had allegedly "failed" two of the validity tests, Dr. Cahn-Weiner expressly declined to give an opinion on whether there were neurocognitive deficits. She also deferred to a neurologist the question whether deficits could be expected years after an AVM resection. AR 1137.

After Dr. Cahn-Weiner issued her report, plaintiff's counsel wrote two letters to Prudential, one on February 6, 2015 (AR 1120-1121), and one on February 10, 2015 (AR 894). In these letters, plaintiff's counsel reported what plaintiff had related concerning the testing by Dr. Cahn-Weiner. According to plaintiff, Dr. Cahn-Weiner initially stated that the testing should not proceed. AR 1120. Plaintiff asserted that Dr. Cahn-Weiner was not prepared to administer tests, and started to "pull different test versions off the shelf." AR 1120. Plaintiff also reported that Dr. Cahn-Weiner gave her assistance during the

testing. AR 1120-1121. Plaintiff claimed that Dr. Cahn-Weiner advised her that Prudential and/or its medical vendor had instructed her to interpret the test results without consideration of plaintiff's education and training, although Dr. Cahn-Weiner advised plaintiff that she did not believe that this was appropriate and she would take those factors into consideration. AR 894.

Prudential again referred plaintiff's claim to Dr. Mittelman for review. On March 2, 2015, Dr. Mittelman reiterated that "[n]o further restrictions were given the claimant such as not being allowed to drive." AR 2572. In response to the question whether the updated or additional information contained any opinions from any of plaintiff's treatment providers regarding her capacity to work, Dr. Mittelman stated that Dr. Forsyth "makes no comments about current work capacity in her last [office visit note] as of [November 25, 2014]," and that Dr. Frye had previously stated she supported plaintiff's disability claim, but made no such statement in the November 25, 2014 office visit note and "makes no statement as to the claimant's capacity to function in everyday settings." AR 2572.

On March 24, 2015, Prudential sent the two letters from plaintiff's counsel to Dr. Cahn-Weiner and asked her to comment on plaintiff's concerns. AR 2517. Dr. Cahn-Weiner did so in an "Addendum Report" dated March 26, 2015. AR 1693-1694. She explained that after she learned that Dr. Hooker was conducting a further evaluation of plaintiff, she arranged to administer a battery of tests that would "minimize the possibility of overlap" between her evaluation and Dr. Hooker's. AR 1693. She said she kept the test forms in a bookcase next to her testing table, and that it thus might have appeared to plaintiff that the tests were being "pulled off the shelf." AR 1693. She added that some of the tests she administered were similar in structure to those given by Dr. Hooker, and that it thus might have appeared that they were identical. AR 1693. As for whether she gave plaintiff any answers, she stated that in some of the tests, feedback is given to the patient in a practice test, in order to ensure that there is adequate comprehension of the particular test. AR 1694. She asserted that she provided no assistance to plaintiff beyond what was allowed in the practice phase. AR 1694.

*Further Review of the Follow-Up Testing*

Following the supplemental testing by Dr. Hooker and the follow-up testing and review by Dr. Cahn-Weiner, Prudential hired yet another neuropsychologist, Kristin Fiano, Ph.D., to review the reports of both Dr. Hooker and Dr. Cahn-Weiner. In a report dated April 14, 2015, Dr. Fiano acknowledged that Dr. Hooker's testing showed that plaintiff's estimated pre-morbid abilities were in the "high average" range and that the testing results showed "significant differences" between the predicted scores and her actual scores. AR 1679. Dr. Fiano acknowledged that the 2013 and 2015 testing evaluations by Dr. Hooker showed similar patterns. AR 1679. She opined that Dr. Hooker's evaluation showed "normal functioning" with "few exceptions," yet she failed to address the significance of the "exceptions." AR 1683.

Dr. Fiano did not find that plaintiff "failed" the validity testing administered by Dr. Cahn-Weiner. Nor did she provide an opinion regarding the second alleged "failure" score, merely stating that it was "described" as "suggesting non credible cognitive performance." AR 1680. She acknowledged that the Cahn-Weiner testing resulted in scores in the borderline range in the fields of memory and attention, with "significant impairment" on the spatial working memory, and that testing in executive functioning varied from high average to impaired range, but noted inconsistencies in the testing, and concluded that the testing was "suspect" and reflected "less than optimal effort." AR 1680-1683.

When asked about the differing opinions of Dr. Cahn-Weiner and Dr. Hooker, Dr. Fiano pointed out that Dr. Cahn-Weiner did not provide an opinion with regard to cognitive impairment, other than to state that her own tests were unreliable. AR 1684. Dr. Fiano acknowledged the veracity of Dr. Hooker's opinion that plaintiff's "average" scores in some areas reflected impairment when compared to pre-morbid conditions, but stated that because there was no neuropsychological testing conducted when plaintiff underwent her original surgery in 1992, there was no way to measure a "decline." Therefore, she opined, there was no "compelling evidence" of functional impairment, as

1    plaintiff could still "manage" two households, drive and travel.  AR 1686.

2         Dr. Fiano was not asked for nor did she give an opinion as to whether plaintiff

3    could perform the highly cognitive demands of her executive position, including "excellent

4    oral presentation skills."  Rather, Prudential asked if plaintiff could perform computer

5    work, communicate effectively with others, or sustain full-time work.  AR 1683.  Dr. Fiano

6    stated that the evidence reviewed did not provide "compelling evidence" of restrictions

7    and limitations in those areas.  AR 1683.

8         In a supplemental report, dated May 4, 2015, Dr. Hooker noted that plaintiff had

9    previously reported problems with dyslexia, and in fact her prior medical records

10   confirmed this.  AR 1154, 1609.  He also pointed out that on the remaining "failed" test,

11   plaintiff's score was actually a passing score, but close to the "caution" descriptor by the

12   test author.  AR 1155.  He explained that in his experience, when a test taker truly "fails"

13   validity scores, there are almost always unrealistically low scores on the actual tests

14   which measure neuropsychological function.  However, in both the exams administered

15   by Drs. Hooker and Cahn-Weiner, the scores were not unrealistically low.  AR 1155.

16        Finally, Dr. Hooker noted that when there are failed or suspect effort results on the

17   performance validity testing, there is almost always over-reporting of symptoms detected

18   on the MMPI-2 (administered by Dr. Hooker) and the PAI (administered by Dr. Cahn-

19   Weiner).  However, he noted that there was no evidence whatsoever of symptom

20   exaggeration on either of these two tests.  AR 1155.  Indeed, Dr. Cahn-Weiner reported

21   that plaintiff completed the PAI test in a "reasonably forthright manner and did not attempt

22   to present an unrealistic or inaccurate impression . . . ."  AR 1135.  This test revealed that

23   plaintiff endorsed confusion, distractibility, difficulty concentrating and communication

24   problems.  AR 1135.

25        Dr. Hooker also addressed Prudential's criticism that his conclusions were

26   improperly based on pre-morbid "estimates" of plaintiff's abilities.  Dr. Hooker stated that

27   he arrived at his pre-morbid predictions of plaintiff based on his administration of the

28   Wechsler TOPF test, which is a validated measure to make expected-actual comparisons

on the Wechsler scales.  AR 1156.  He explained that a score in the "average" range can represent impairment in an individual who is pre-morbidly above average, with a decreased ability to perform a cognitively demanding task.  AR 1156, 1157.  He also reported that plaintiff showed clear deficits in the memory testing tests administered by both himself and Dr. Cahn-Weiner.  AR 1157.

*Denial of Plaintiff's First Appeal*

Prudential denied plaintiff's appeal on May 20, 2015.  AR 2499-2514.  In its denial letter, Prudential acknowledged that the testing by the speech therapist showed mild aphasia and deficits within attention, auditory processing, memory, thought organization and executive functioning.  AR 2502.  Prudential also noted that Dr. Hooker concluded that plaintiff was disabled from working in her usual and customary executive position or any position requiring "higher level cognitive functioning."  AR 2508.

However, Prudential discounted Dr. Hooker's findings, stating that they were based on a comparison to pre-morbid estimates (even though the pre-morbid estimates were based on cognitive testing), and that there was no "significant correlating event" such as significant MRI findings.  AR 2503.  Prudential also stated that Dr. Hooker's evaluation "failed to support any severe cognitive impairment in functioning."  AR 2512; see also AR 2508.  Prudential added that plaintiff's "self reported" symptoms were not supported by imaging or electro-diagnostic testing and noted that she was not "restricted from driving."  AR 2503; see also AR 2513.

Prudential conceded that Dr. Cahn-Weiner did not provide an opinion with regard to cognitive impairment other than to state that she did not have valid and reliable evidence to support cognitive impairment.  AR 2509, 2512.  However, Prudential asserted, Dr. Cahn-Weiner's conclusion was "based on the failed performance validity measures" and was "supported given the available raw data."  AR 2509.  Nevertheless, Prudential did not address the fact that Dr. Cahn-Weiner declined to offer an opinion based on the perceived invalidity of her testing.

Prudential reported that the 2015 Hooker evaluation did not show any "severe

cognitive impairment in functioning" "primarily fell within the average range." AR 2512. Prudential also admitted that there was a statistical difference between expected scores and obtained scores; however, it denied the claim because it "could not be concluded [that] the discrepancy was the result of recent declines in functioning." AR 2512.

Prudential also found Dr. Hooker's opinion that plaintiff's cognitive impairment interfered with her ability to perform the usual duties of her occupation or any occupation requiring higher executive functioning to be "inconsistent" with the fact that he did not restrict or limit her in any way, "including her ability to operate a motor vehicle." AR 2512. In Prudential's view, if plaintiff's cognitive symptoms were "were enough to limit her capacity to perform her usual sedentary level work duties," it was inconsistent for Dr. Hooker to fail to limit her from "safety sensitive duties such as operating a motor vehicle." AR 2512. In addition, Prudential cited plaintiff's alleged ability to "manage" two households, drive, and travel, which it claimed showed that she was "functionally independent." AR 2512. Prudential gave plaintiff the option of pursuing a second, voluntary appeal. AR 2513-2514.

On June 15, 2015, less than a month after Prudential issued the May 20, 2015, denial letter, plaintiff was approved for Social Security disability benefits under the "any occupation" criteria utilized by the Social Security Administration. AR 2216.

*Plaintiff's Second Appeal*

Plaintiff submitted her second appeal to Prudential on August 31, 2015. AR 2610. With this appeal, plaintiff submitted her recent favorable Social Security Award, dated June 15, 2015; an August 15, 2015, independent record review by neurologist Ezekiel Fink, M.D., AR 2620; copies of e-mails from and to Blue Shield employees (including plaintiff), dated May 10, 2013, to April 23, 2014, AR 2700-2716; and information from the California Department of Motor Vehicles ("DMV") regarding driving and "Lapses of Consciousness Disorders," AR 2717-2718.

Plaintiff asserted that the employer emails established that both Blue Shield and Prudential knew about her part-time schedule during the period from May through

August, 2013, and that Blue Shield actively assisted her in making her disability claim. AR 2611-2612. Plaintiff noted that Prudential had made no inquiries to Blue Shield regarding the decision to approve her life waiver of premium claim, or regarding Ms. Jackson's statements regarding her observations of plaintiff's cognitive difficulties in 2011-2012. AR 2613-2614. Those difficulties resulted in plaintiff being placed on an IDP for improvement, the assumption of certain job duties by Ms. Jackson to "cover" for plaintiff, and the reporting of plaintiff's cognitive deficiencies to the CEO and CFO of Blue Shield prior to Ms. Jackson's departure from the company. Plaintiff also noted that her supervisor, Ms. O'Hara, had announced that plaintiff's departure for "health reasons" would cause certain organizational changes within the Company. AR 2160, 2614.

Dr. Fink, the neurologist who conducted the independent record review is board-certified in Neurology, Pain Medicine, and Brain Injury Medicine. He is also an Assistant Clinical Professor at the David Geffen School of Medicine/UCLA Department of Neurology. AR 2646-2647. Dr. Fink reviewed plaintiff's medical records and the reports of the all the testing, including records from Dr. Frye, Dr. Hooker, and Dr. Cahn-Weiner, as well as the various record reviews. AR 2621-2641.

After a review of plaintiff's MRI, Dr. Fink noted that the resected area of plaintiff's brain showed a lobe cavity which appeared larger – which he stated should not be the case more than 20 years after a resection. AR 2620. He explained that plaintiff's language issues were neuro-anatomically consistent with an anterior temporal lobe lesion. AR 2622. He noted that Dr. Cahn-Weiner did not offer an opinion regarding plaintiff's cognitive deficits, but rather, deferred to a neurologist regarding the long term outcome data for patients undergoing successful AVM removal. AR 2639-2640.

Dr. Fink discounted the predicates for the opinions of Dr. Cahn-Weiner and Prudential based on the "normal" EEG test. As indicated above, Dr. Frye originally explained that EEG testing may be normal in patients with probable epilepsy. AR 550, 1615. Dr. Fink stated that a single routine EEG record may be normal in 30-50% of patients with probable epilepsy, and the yield for abnormalities increases with multiple

records. AR 2640. Dr. Fink also criticized the premise relied upon by Dr. Cahn-Weiner and Dr. Fiano that plaintiff's social activities and her continued driving was evidence that she did not suffer from cognitive impairment: "Ms. Murphy's ongoing driving does not provide sufficient evidence that she has maintained the ability to function as an executive in a very demanding job as most 16 year olds in this country can attest to." AR 2645. Nevertheless, he did recommend that plaintiff "go for a driving assessment." AR 2645.

Dr. Fink's conclusion provided the neurological explanation of plaintiff's cognitive deficits; he opined that plaintiff's long term complaints of language/memory difficulties "are consistent with the neuroanatomical location of her AVM in the left temporal lobe." AR 2646. Dr. Fink opined that the cognitive decline was due to plaintiff's age-related decline and the fact that compensatory measures she once used were no longer working, and stated that patients with left temporal lobe surgery may be more at risk for a rapid decline in selective memory skills. AR 2642. This was similar to the opinion of Dr. Nassan in December 2013 that while plaintiff's AVM was "successfully repaired," the surgery left the area more vulnerable to cognitive and memory decline that happens in aging, and thus that the compensation mechanisms that plaintiff once utilized no longer worked. AR 2042, 2066. Dr. Fink stated "conclusively" that "even if the invalid neuropsychological testing is discarded and only the expected areas of deficit are included (ie, language and memory), Ms. Murphy is unable to return to her prior work." AR 2646.

Prudential sent Dr. Fink's report to Dr. Fiano for review. In a November 10, 2015, report, Dr. Fiano first summarized Dr. Fink's opinions regarding plaintiff's cognitive functioning. She reported that Dr. Fink pointed to several aspects of the testing by Dr. Hooker, and concluded that there was evidence of impairment; that he detailed plaintiff's medical history, noting that individuals with AVM tend to have learning problems due to the effect the AVM has in areas of the brain involving language/memory; that he stated that atypical development of the brain secondary to AVM could have explained the evidence of impairment in function not typically associated with the left temporal lobe;

that he listed several potential causes for a decline more recently which would have explained plaintiff's problems on the job, such as long-term effects of neurosurgery and an ongoing seizure disorder, microvcascular disease, and medication side effects; and that he indicated that even if the test scores that showed impairment in unexpected areas were discounted, the remaining scores showed impairment in language and memory sufficient to preclude plaintiff from being able to return to her job.  AR 2595.

Dr. Fiano also responded to a request that she indicate whether, based on her prior review of plaintiff's claim, she agreed with Dr. Fink's opinions.  She stated that Dr. Fink "expressed many opinions in this review, some of which I agree with."  AR 2595.  She agreed that the AVM and associated seizures would have been expected to impact neurodevelopment, but she opined that the extent of this impact did not appear significant given that plaintiff had completed a graduate degree and was employed as a corporate executive.  AR 2595.  She agreed there was a basis for long-standing weaknesses for which plaintiff was able to compensate successfully, but asserted that "several factors" could impact plaintiff's perception of more recent declines, including "the normal aging process."  AR 2595.  She agreed that longer-term declines are "sometimes experienced in neurosurgical candidates," but opined that "the period of decline just in the last couple of years is more difficult to explain as being directly related to the surgery in 1991."  AR 2595.  She also indicated that if a progressive decline were related to a remote history of surgery, "it would not be anticipated that scores on neuropsychological testing would vary across assessments with some scores improving from impaired to average."  AR 2595.

Despite agreeing with a number of his conclusions, Dr. Fiano stated that Dr. Fink's opinion did not substantially alter her prior review.  As in her April 14, 2015, report, see AR 1686, she reiterated that because there was no prior testing from the time period of the original AVM surgery, it could not be "assumed that the more recent test scores reflect a significant decline."  AR 2596.  She added that plaintiff had previously "endorsed symptoms of depression, becoming more prominent by Dr. Hooker's second evaluation in 2015[,]" opining that while "[d]epression alone would not be expected to cause significant

33

cognitive impairment," it "could serve to magnify [plaintiff's] perception of cognitive

symptoms."  AR 2596.  Thus, she asserted, "evaluation of this factor is critical in

analyzing the obtained data."  AR 2596.

*Denial of Plaintiff's Second Appeal*

In a letter issued December 9, 2015, Prudential upheld its prior decision to

disallow plaintiff's claim for LTD benefits.  AR 3203-3210.  In the denial letter, Prudential

summarized plaintiff's "History" as follows:

> The information in [the] file indicated Ms. Murphy began
> reducing her work hours effective May 24, 20 13 due to
> symptoms of cognitive problems which she attributed to a
> history of partial complex seizures and-left temporal lobe
> AVM.  The record indicated Ms. Murphy underwent a
> stereotactic craniotomy and dissection of Arteriovenous
> Malformation (AVM) in 1991.  The record confirmed Ms.
> Murphy recovered from that procedure and worked for over 20
> years following this procedure with no known complications
> documented in her record of treatment.  The record indicated
> in May 2013, Ms. Murphy was information [sic] her position
> was being eliminated.  The record indicated in May, 2013, Ms.
> Murphy reported she has been experiencing increased
> cognitive symptoms attributed to increased seizure disorder in
> the six to eight months preceding her decreased work hours in
> May, 2013.  A review of her record revealed, despite her
> report of six to eight months of increased seizure and
> cognitive issues, she had no medical treatment in that time
> period, by any treatment provider.  Her first consultations for
> such symptoms did not occur until May, 2013. Further, Ms.
> Murphy's file contained email communications between Ms.
> Murphy and her treatment providers in which Ms. Murphy was
> documented to be directing her physicians with information
> needed for her disability claims.  Information from Ms.
> Murphy's Employer confirmed they had no record she had
> decreased her work hours to part time at any point due to a
> medical condition.  Ms. Murphy's Employer further confirmed
> facets of her occupation were transferred to others as her
> position was broken down through her eventual work
> stoppage which was noted to be effective September 1, 2013
> at which time Ms. Murphy was placed on administrative leave.
> A review of record [sic] was performed and revealed no
> evidence of a progression of Ms. Murphy's longstanding
> medical conditions leading to her reported decrease in work
> hours or her subsequent total work stoppage.  As such, Ms.
> Murphy's LTD claim was disallowed. . . .
>
> This decision was upheld on our initial appellate review of Ms.
> Murphy's claim. Part of our review included a review by our
> Medical Director boarded in Occupational Medicine, a
> Neuropsychological Independent Medical Examination (IME),

> and a review of the claim file by an independent physician
> boarded in neuropsychology. The results of our review
> showed no medically supported evidence to support Ms.
> Murphy experienced any physical, cognitive or psychological
> impairment to render her as disabled from performing the
> duties of her usual occupation. As such, the decision to
> disallow Ms. Murphy's pending LTD claim was upheld.

AR 3204-3205.

In its review of plaintiff's evidence, Prudential discounted the May 2013 emails, on the basis that they were dated prior to the date plaintiff submitted her LTD claim to Prudential, and thus "were not part of the LTD determination process." AR 3205. As for Dr. Fink's findings following his review of plaintiff's records, Prudential simply repeated the opinions of Dr. Fiano (without attribution, other than a reference to the fact that Prudential had forwarded the additional information to its reviewing neuropsychologist for review), up to and including the conclusion that the updated information and comment by Dr. Fink did not substantially alter "the prior review." See AR 3205-3208.

Prudential listed plaintiff's job responsibilities as a VP of Human Resources, AR 3209, but did not address the question whether the evidence showed that plaintiff was disabled from performing the duties of her usual occupation. Prudential reiterated that in May 2013, plaintiff had learned that her job was being eliminated, AR 3204, 3209, and that she "would no longer be working for the organization," AR 3210, and suggested that what drove plaintiff to apply for LTD benefits was the elimination of her job. Prudential found no evidence "to support her claim of being disabled from working." AR 3210.

### DISCUSSION

A. Legal Standard

Under ERISA § 502(a), a beneficiary or plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); see also Aetna Health Inc. v. Davila, 542 U.S. 200, 210 (2004).

A claim of denial of benefits in an ERISA case "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 629 (9th Cir. 2009). Here, the court has already determined that the standard of review of plaintiff's claim is de novo.

In conducting a de novo review of an ERISA plan's denial of benefits, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006) (en banc); Opeta v. Nw. Airlines Pension Plan, 484 F.3d 1211, 1217 (9th Cir. 2007) (court reviewing denial of benefits de novo should determine whether the plaintiff is entitled to benefits based on the evidence in the administrative record, except in certain limited circumstances). The de novo standard requires the court to make findings of fact and weigh the evidence. See Walker v. Am. Home Shield Long Term Disability Plan, 180 F.3d 1065, 1069 (9th Cir. 1999).

Typically, a request to reach judgment prior to trial would be made under a Rule 56 motion for summary judgment; however, under such a motion the court is forbidden to make factual findings or weigh evidence. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). As an alternative, the court can conduct a trial on the administrative record under Rule 52. This procedure is outlined in Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999), where the Ninth Circuit noted that "the district court may try the case on the record that the administrator had before it." Id. at 1095. In a trial on the administrative record:

> The district judge will be asking a different question as he reads the evidence, not whether there is a genuine issue of material fact, but instead whether [the plaintiff] is disabled within the terms of the policy. In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.

Id.

Thus, when applying the de novo standard in an ERISA benefits case, a trial on the administrative record, which permits the court to make factual findings, evaluate

credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute. See Casey v. Uddeholm Corp., 32 F.3d 1094, 1099 (7th Cir.1994); see also Lee v. Kaiser Found. Health Plan Long Term Disability Plan, 812 F.Supp.2d 1027, 1032 (N.D. Cal. 2011) ("De novo review on ERISA benefits claims is typically conducted as a bench trial under Rule 52.").

When the court reviews a plan administrator's decision de novo, the burden of proof is placed on the claimant to show entitlement to benefits under the terms of the plan. See, e.g., Muniz v. Amec Constr. Mgmt, Inc., 623 F.3d 1290, 1294-95 (9th Cir. 2010) (citations omitted); see also Estate of Barton v. ADT Sec. Servs. Pension Plan, 820 F.3d 1060, 1065-66 (9th Cir. 2016) (citing Muniz and noting "[t]his rule makes sense in cases where the claimant has better – or at least equal – access to the evidence needed to prove entitlement").

B.      The Parties' Cross-Motions

Plaintiff argues that Prudential incorrectly denied her claim for LTD benefits.  She asserts that the weight and credibility of the evidence establishes that she is disabled from her own occupation, and that she has provided evidence showing a decline in cognitive abilities.

Plaintiff cites to statements by Dr. Forsyth and Dr. Frye in 2013, and accompanying office notes; to Dr. Hooker's initial neuropsychological testing in October 2013; to the review of the records and Dr. Hooker's testing by Sedgwick's in-house reviewer, Dr. Ross, in February 2014; to Dr. Attfield's March 2014 review of Dr. Hooker's testing; to Dr. Hooker's repeat neuropsychological testing in January 2015; to Dr. Cahn-Weiner's PAI testing in January 2015; to Dr. Attfield's May 2015 supplemental review of Dr. Hooker's repeat testing; and to Dr. Fink's August 2015 report in which he provided a neurological explanation of how the AVM resection would impair her language skills and memory years after the original surgery.  In addition, she cites to the statements by Ms. Jackson in her declaration, to the Social Security disability determination, to Blue Shield's determination that plaintiff qualified for a life waiver of premium.  She asserts that this

1    evidence shows that she was unable to perform her occupation as a Blue Shield

2    Executive.

3         Defendants argue that Prudential's determination was well-reasoned and correct.

4    They assert that there is no record from Blue Shield that plaintiff was on leave or on a

5    reduced work schedule due to a disability or that she requested leave to work part-time.

6    They claim, to the contrary, that Prudential learned from Sedgwick and Blue Shield that

7    plaintiff's job was being phased out, and that plaintiff had signed an agreement which led

8    to her going on administrative leave.  They contend that plaintiff submitted her LTD claim

9    just prior to completing her administrative leave, and that she "authored" her doctor's

10   reports supporting disability.  They argue that the timing of plaintiff's claim and her

11   actions with regard to her doctor's reports raise "suspicion" as to whether she is actually

12   disabled, or is instead seeking to use the LTD benefits as a "bridge to retirement."

13        Defendants also assert that plaintiff claims that her disability stems from cognitive

14   issues and partial complex seizures related to her left temporal lobe AVM, but that

15   medical records reflect that she did not seek any treatment related to this condition until

16   May 2, 2013, which was 20 years after her last follow-up treatment for the AVM.  They

17   argue that Prudential's denial of plaintiff's claim is supported by opinions of numerous

18   medical professionals physicians who are experts in fields relevant to plaintiff's condition.

19   They cite to the record reviews by Drs. Attfield, Wadhwa, and Neuren, and contend that

20   all three concluded that plaintiff's condition did not warrant restrictions or limitations that

21   would preclude work.  Defendants also point to the reviews by Drs. Mittelman, Cahn-

22   Weiner, and Fiano, which they claim show that Prudential's decision that plaintiff was not

23   disabled under the terms of the Plan was well-supported.  Finally, defendants argue that

24   there is no evidence that Prudential ignored any of plaintiff's treating physicians'

25   conclusions.

26        The court finds that plaintiff's motion must be GRANTED and that defendants'

27   motion must be DENIED.  Plaintiff has established that she is disabled from performing

28   the substantial and material acts necessary to pursue her usual occupation of VP of

1  Human Resources at Blue Shield, and that she was in fact not performing the substantial

2  and material acts of her usual occupation in 2013.

3      First, plaintiff has provided evidence showing she is cognitively disabled from

4  performing the duties of her job as a VP of Human Resources at Blue Shield.  As

5  explained above, Prudential acknowledged in March 2014 that the VP of Human

6  Resources was responsible for "delivering excellent execution" of programs offered by

7  HR teams/functions; and that the "cognitive skills" required for this position included the

8  ability to "[t]hink creatively, strategically, concretely, and abstractly."  In addition, the VP

9  of Human Resources was required to "[r]ead, comprehend and use written materials

10 including graphs, charts and displays[;]" [t]hink critically and act logically to evaluate

11 situations, solve problems and make decisions[;]" "understand and solve problems

12 involving analytics and use the results[;]" "[w]ork independently and change focus (for

13 example, juggling priorities)[;]" and "manage time effectively."  AR 809-810.

14     Plaintiff has cited to evidence showing that she was cognitively disabled from

15 performing such executive functions, including contemporaneous medical records,

16 reports of repeated neuropsychological testing, record reviews, and observations by her

17 supervisor and co-workers at Blue Shield.  Statements and office notes of Drs. Forsyth

18 and Frye support her claim of disability, see AR 879, 1259, 1565, 1567, 1575, 1663; as

19 do the reports by Dr. Hooker of his initial neurological testing in October 2013, AR 502-

20 517; the review of the records and Dr. Hooker's testing by Sedgwick's in-house reviewer,

21 Dr. Ross, see AR 502-506, 880; the report of Dr. Hooker's repeat testing in January

22 2015, see AR 904-915; the report of Prudential's in-house reviewer, Dr. Attfield, and his

23 comments about Dr. Hooker's testing, see AR 819; and the record review of plaintiff's

24 consulting neurologist, Dr. Fink, see AR 2621-2641.

25     Significantly, Drs. Forsyth, Hooker, Ross, Attfield, Frye, and Fink all indicated that

26 plaintiff is disabled from returning to her prior occupation as a Blue Shield executive.

27 Initially, on May 8, 2013, Dr. Forsyth advised Blue Shield that plaintiff's medical condition

28 "precludes her from successfully performing her job duties[,]" adding that [h]er condition

39

is under additional neurologic testing, after which further updates of disability dates will be determined."  AR 558.

On October 16, 2013, Dr. Hooker issued a report on the results of the recent neuropsychological testing of plaintiff, and stated, "In my opinion, . . . she is disabled from work in her usual and customary executive position, or any occupation requiring higher cognitive functioning."  AR 517.

On February 11, 2014, Dr. Ross found, after reviewing Dr. Hooker's report, that the results "confirmed a cognitive disorder, impacting language disturbances, memory, executive functioning, right sided motor skills, and visual spatial dysfunction, in which the combination of cognitive difficulties demonstrated would preclude her ability to function in her regular, unrestricted occupation."  AR 079.

On March 4, 2014, Dr. Attfield, Prudential's consulting neuropsychologist, reviewed plaintiff's claim and the results of Dr. Hooker's testing, and concluded that while plaintiff "has a work capacity," her "cognitive restrictions would be expected to limit her from a position requiring higher executive skills and facile social interaction."  AR 820.  In a May 5, 2014, follow-up report, Dr. Attfield reiterated that based on Dr. Hooker's report, impairment was supported until updated neuropsychological testing could be obtained. AR 793.

In July 2014, Dr. Frye, the neurologist to whom plaintiff was referred by Dr. Forsyth, conducted a "neurology follow up."  In a note dated July 15, 2014, Dr. Frye reported on plaintiff's December 2013 consult with Dr. Hassan at the UCSF Memory Clinic; and concluded that plaintiff "presents with mild cognitive impairment," and that "[b]ased on her symptoms and evaluation, it does not appear she will be able to return to her prior occupation."  AR 1256.

On February 9, 2015, Dr. Hooker issued a report following the repeat neuropsychological testing he had administered in January 2015.  AR 895-915.  Dr. Hooker stated that plaintiff "continues to demonstrate neuropsychological identified in October 2013," and she "continues to be disabled from work in her usual and customary

executive position, or in any occupation requiring higher cognitive functioning." AR 915.

On August 21, 2015, following his review of plaintiff's medical records as well as the various office notes and/or evaluations of Ms. Shimamoto, Dr. Hooker, Dr. Frye, Dr. Cahn-Weiner, and Dr. Fiano, Dr. Fink issued a report, in which he concluded, "As a Harvard trained triple board certified neurologist with a subspecialty in brain injury medicine I can conclusively state that even if the invalid neuropsychological testing is discarded and only the expected areas of deficit are included (ie language and memory), Ms. Murphy is unable to return to her prior work." AR 2646.

Dr. Fink also addressed the question whether plaintiff's complaints of difficulties with language and memory were consistent with the AVM surgery more than 20 years previously. AR 2641-2642. His opinion provided a further neurological explanation of plaintiff's cognitive deficits, and confirmed the medical basis for plaintiff's disability. He explained how the AVM resection would (or could) impair her language skills and memory years after the original surgery, and noted that her complaints were consistent with long-range studies showing impairments in language and memory with patients with temporal lobe resections. AR 2641-2642, 2646.

In addition, the court notes that Blue Shield determined that plaintiff qualified for a life waiver of premium, under the "any occupation" criteria, see AR 2107; that the Social Security Administration found her "totally disabled" under the "any occupation" criteria, see AR 2676; and that plaintiff's former supervisor and co-workers commented on her increasing difficulties with speech and memory in 2011-2012, see AR 1932-1935, 1928-1930, 2100-2101, 2113-2115. While the life waiver of premium, the Social Security determination, and the observations of plaintiff's former supervisor and co-workers are not medical evidence, they are undisputed and certainly support plaintiff's position here.

Defendants, on the other hand, have provided no medical evidence or evaluation that contradicts the conclusions of Drs. Forsyth, Hooker, Ross, Attfield, Frye, and Fink that plaintiff is unable to perform the usual and customary duties of her occupation as a VP of Human Resources at Blue Shield. At most, defendants' reviewers have opined

that the evidence shows that plaintiff is not disabled from "working" or from "gainful

employment." However, the issue for decision in these cross-motions is whether plaintiff

has established that she is disabled from working at her own occupation, not whether she

has shown that she is disabled from performing any occupation. At a minimum,

Prudential should have compared plaintiff's mere "average" abilities – as reflected in the

testing administered by both Dr. Hooker and Dr. Cahn-Weiner – with its vocational

review, which stated that "higher executive functioning" was required to perform the

occupation of VP of HR. See AR 813.

None of Prudential's record reviewers expressed the view that plaintiff would be

able to continue in her position as a Blue Shield executive. Dr. Wadhwa stated on May

20, 2014, that plaintiff "should likely have psychological competence for work," but

declined to provide an opinion as to whether she could "handle the executive functions of

her job" – a question he believed "needs to be answered by occupational experts" as he

found it "outside the realm of this review." AR 784. He subsequently wrote to Dr. Frye,

stating that plaintiff "may not have the executive skills to carry out her job functions;" but

opining that she "has the capacity to work." AR 853.

Nor did Dr. Neuren address the question whether the records showed that plaintiff

was disabled from her usual occupation. In his brief report on June 5, 2014, Dr. Neuren

simply found "no plausible or credible reason for her to be cognitively impaired at this

time." AR 773. He concluded that because plaintiff returned to work as a nurse following

her 1991 surgery, and because there was "no evidence of any recurrence of the AVM,"

she was capable of "gainful employment." AR 773.

Dr. Mittelman, who reviewed plaintiff's claim following the submission of her first

appeal, stated on November 12, 2014, that there was "no basis for restricting" plaintiff

from sitting, standing, walking, reaching, lifting, carrying, or performing upper extremity

activities on a sustained full time basis from May 24,2013, onward. AR 2560. When

asked to comment on the opinions of plaintiff's treatment providers, he referred to Dr.

Hooker's October 2013 opinion that plaintiff had cognitive dysfunction that precluded her

working in her usual and customary executive position or any position requiring cognitive functioning, but added only that "[n]o driving restrictions were given, as would be expected in a patient with an active seizure disorder." AR 2560. He did not provide any reason to discount Dr. Hooker's opinion that plaintiff was disabled from working in her usual and customary executive position.

The opinions of Prudential's independent evaluator, Dr. Cahn-Weiner, and its independent reviewer, Dr. Fiano, do not contradict plaintiff's evidence. Dr. Cahn-Weiner conducted neuropsychological testing, and while she reported that the PAI showed endorsement of confusion, distractibility, difficulty concentrating, and problems communicating clearly with other people, see AR 1135, she declined to offer an opinion with regard to whether plaintiff's complaints could be attributed to the 1991 AVM resection, or whether spontaneous development and subsequent progression of cognitive deficits could be expected following a successful AVM removal, a question she deferred to a neurologist. AR 1137. She also concluded that "[f]unctional impairment from a cognitive standpoint cannot be determined" because the neuropsychological test data was "invalid due to suboptimal effort." AR 1137; see also AR 1133, 1136.

Dr. Fiano, to whom Prudential referred the reports of Dr. Hooker and Dr. Cahn-Weiner for review, acknowledged the veracity of Dr. Hooker's opinion that the results of the testing reflected impairment, but stated that because there had been no neuropsychological testing at the time of plaintiff's original surgery, there was no way to measure a "decline" since that time, and thus no evidence of functional impairment. AR 1685-1686.

The suggestion that plaintiff cannot prove disability with objective tests unless she received testing prior to the onset of the disability is illogical, because one does not obtain testing when there is no suspected impairment, and conversely, obtains testing only when there are suspected deficits. Moreover, the evidence shows that Dr. Hooker administered well-accepted tests to ascertain plaintiff's pre-morbid abilities, based on her education, training and experience. Based on these tests, Dr. Hooker concluded that the

43

"average" test results represented a significant decline in functioning. AR 515-517.

In addition, the decline in plaintiff's cognitive abilities is anecdotally shown by Ms. Jackson, who states in her declaration that she worked with plaintiff for more than eight years, and she observed a decline in plaintiff's cognitive functioning in 2011-2012. AR 1932, 1934. This decline was of such a severity that Ms. Jackson created an IDP to improve plaintiff's skills, and also informed the CEO and CFO of Blue Shield of the suspected cognitive impairment before leaving Blue Shield in February 2013. AR 1934, 1935. Moreover, plaintiff's cognitive difficulties were witnessed by her co-workers and subordinates, Craig Cadwallader, Earl Barron, and Kerry Hanchett. See AR 1928, 2100, 2113.

Dr. Fiano also did not address the specific deficits identified by Dr. Hooker in the 2013 and 2015 testing. In 2013, those deficits were speech language (borderline); word fluency (low average); visual spatial processing (impaired). AR 1676. In areas where the performance was average, it was also frequently "below expectations." AR 1676. Dr. Fiano acknowledged that in the 2015 testing, plaintiff tested low average in divided attention, initial memory recall, language naming skills, and executive functioning. However, rather than discussing the consequences of these deficits, Dr. Fiano opined that many of the other fields yielded "average" results, without discussion of the consequences of the deficits which were identified. AR 1677-1679.

However, Dr. Hooker explained that the mere "average" cognitive deficits identified in the testing represented a decline in plaintiff's function, and resulted in an inability to perform her occupation. See, e.g., AR 1155-1157. Prudential's own vocational assessment stated that "higher level executive functioning is routinely utilized to strategically implement policies and practices that comply with ever-changing state, local, and federal law." AR 803. A person with "low average" or "borderline impaired" or even "average" test results cannot be considered to have "higher level executive functioning."

Finally, with regard to plaintiff's job functions, Dr. Fiano was asked to give an opinion only on plaintiff's ability to perform "computing functions," to "effectively

communicate with others," to "concentrate," and to work "full time."  AR 1683.  Plaintiff's

job duties went far beyond "computing functions," "effective communication" and

unspecified levels of "concentration," as she was required to "read, analyze and interpret

the most complex documents and articulate conclusions[,]"  and was also required to

provide "excellent written, oral and presentation communications . . . [including]

persuasive speeches and presentations on controversial or complex topics to the Board

and outsiders."  See AR 808-814.

Second, the evidence shows that plaintiff was not performing the substantial and

material acts necessary to pursue her usual occupation of VP of Human Resources at

Blue Shield in 2013.  Defendants contend that there is no record from Blue Shield that

plaintiff was on leave or on a reduced work schedule due to a disability or that plaintiff

requested to work part time, and also assert that Prudential learned from Sedgwick and

Blue Shield that plaintiff's job was being "phased out" and that she had signed an

agreement which led to her administrative leave.  The court finds these arguments to be

without merit.

Defendants' assertion that plaintiff was performing all the substantial and material

acts of her usual occupation during the period May-August 2013 appears to be entirely

speculative.  Prudential initially advised plaintiff that her claim would be approved, and

subsequently changed its position based on some determination that plaintiff's job had

been "phased out" or "eliminated."  From this, Prudential speculated that plaintiff was not

disabled, and that her departure from Blue Shield was not related to her inability to

perform her job duties.  However, there is no evidence that Prudential received any

information from Blue Shield that plaintiff's job was scheduled for elimination prior to the

time she went out on disability leave.  Moreover, the contemporaneous evidence shows

that she was in fact unable to perform her job duties due to her cognitive decline.

In its denial letter, Prudential cited emails from Ms. St. John, which it interpreted as

denying that plaintiff worked a reduced work schedule in the summer of 2013, and then,

based on this "evidence," concluded that plaintiff performed all of her job duties until the

fall of 2013.  However, during her claim and her first appeal, plaintiff proved that she worked a part-time schedule due to her disability, with the knowledge and approval of Blue Shield.  Indeed, Blue Shield even helped her file her disability claim.  The emails between plaintiff, the Blue Shield Absence Manager, Prudential, and Ms. O'Hara, along with other Blue Shield documents, substantiate plaintiff's claim that she was working a reduced work schedule due to her disability in the summer of 2013, and that during that period she was working with Blue Shield to transition her former job duties to other employees.  See, e.g., AR 246-248, 2152, 2158, 2160, 2161, 2163, 2165, 2183, 2195, 2213-2215.

Defendants' only support for its assertion that plaintiff's job was being "phased out" prior to the time she found it necessary to apply for LTD benefits is a single phone log record, purporting to record details of a phone conversation between a Sedgwick representative and a Prudential claim consultant, to the effect that plaintiff's job was being "eliminated" in May 2013, and that plaintiff had reached an "agreement" with Blue Shield regarding this purported organizational change.  Defendants also cite some out-of-context remarks from emails referring to a "transition" of plaintiff's job, and a "structural reorganization."

Nor do defendants provide any clear evidence of any agreement between plaintiff and Blue Shield pursuant to which Blue Shield would eliminate plaintiff's job and support her made-up claim for disability.  By contrast, as explained above, the evidence provided by plaintiff shows that her co-workers began observing evidence of cognitive deficits during 2012; that she consulted her primary care physician, Dr. Forsyth, in early May 2013; that her primary care physician referred her to Dr. Frye, a neurologist, who ordered tests and referred her to a neurologist for evaluation; that she was subsequently referred to a speech therapist for memory and speech evaluation, and later, to Dr. Hooker for neuropsychological assessment; and that the consensus of the medical professionals was that she was disabled from performing the duties of her job as a VP at Blue Shield, or any job requiring higher executive functioning.

1    Notwithstanding the lack of evidence, Prudential evidently communicated its

2    conclusion – that plaintiff applied for disability benefits <u>because</u> her job was being

3    "phased out" – to its internal medical reviewers.  <u>See</u> AR 773 (June 5, 2014, statement by

4    Dr. Neuren that "insured's job was in the process of being phased out"); AR 2560 (Apr.

5    12, 2014, statements by Dr. Mittelman that "the downsizing of the claimant's position

6    began in December 2012[,]" and that "[t]he only significant correlate with the claimant's

7    self-reported cognitive decline was the effect on her job position, which was necessitated

8    by business concerns not on the basis of the claimant's ability to perform").

9    Prudential provided Drs. Cahn-Weiner and Fiano with similar unfounded

10   information.  In December 2014, Prudential instructed Dr. Cahn-Weiner that the medical

11   information did not support disability and that plaintiff "became aware in May 2013, her

12   job was being eliminated."  AR 2533.  In March 2015, Prudential instructed Dr. Fiano that

13   plaintiff had been advised by Blue Shield in May 2013 that her position was being

14   eliminated, that the record did not support disability, and that she continued to perform

15   her work duties through the end of August 2013.  AR 2518.

16   The theory that after plaintiff learned that her position was being eliminated, she

17   "decided to reduce her work hours effective May 24, 2013," allegedly due to seizures and

18   cognitive deficits, and that plaintiff subsequently entered into a "confidential agreement"

19   with Blue Shield, pursuant to which she would be paid through 2013 but would be

20   permitted to go out on administrative leave at the end of August 2013, appears to have

21   been developed by a Prudential claim consultant, based on her own interpretation of

22   comments made by representatives of Sedgwick and others, and which she then

23   proceeded to communicate to Prudential's internal record reviewers and its independent

24   reviewers.

25                                          **CONCLUSION**

26   In accordance with the foregoing, plaintiff's motion is GRANTED, and defendants'

27   motion is DENIED.  The court finds that plaintiff has met her burden of proving that she is

28   disabled from her own occupation as a Vice President of Human Resources at Blue

47

Shield, under the terms of the Plan.  The decision of Prudential to deny plaintiff's claim for LTD benefits is reversed, and plaintiff is reinstated to the Plan.

Prudential is hereby ORDERED to pay retroactive disability benefits for the 24-month period of disability, with interest.  Plaintiff may bring a motion for attorney's fees, within 14 days of entry of judgment, in accordance with Civil Local Rule 54-5(a), unless otherwise ordered pursuant to a stipulated request under Civil Local Rule 6-2, or a motion under Civil Local Rule 6-3.  Plaintiff shall submit a proposed judgment within 10 days of the date of this order.

In addition, defendants have requested that, to the extent the court awards benefits, plaintiff's claim be remanded to Prudential for a determination of disability under the "any occupation" provision of the Plan, which becomes effective 24 months after the date of initial disability.  The parties appeared to be in agreement as to this issue at the hearing, and the court therefore ORDERS that, once the judgment is entered in this case, the matter shall be remanded to Prudential for a determination of plaintiff's entitlement to Plan benefits under the "any occupation" provision.

**IT IS SO ORDERED.**

Dated:  April 11, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge